IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ASPEX EYEWEAR, INC., et al.,        §
                                    §
      Plaintiffs-                   §
      counterdefendants,            §
                                    §    Civil Action No. 3:02-CV-0634-D
VS.                                 §
                                    §
E'LITE OPTIK, INC.,                 §
                                    §
      Defendant-                    §
      counterplaintiff,             §

MEMORANDUM OPINION

In this patent infringement action concerning an invention
that uses magnets to facilitate the secure attachment of an
auxiliary lens frame to a pair of eyeglasses, the court construes
disputed claim limitations.

I

Because it is unnecessary for purposes of this memorandum
opinion to recount the facts of this case at length, the court will
set out only the background facts necessary to provide the basic
context for its claim construction.[1]  Plaintiffs-counterdefendants
Aspex Eyewear, Inc. and Contour Optik, Inc. (collectively, "Aspex")
hold United States Patent No. RE37, 545E ("the '545 patent").  The
'545 patent is a reissue patent that relates to an invention that

---

[1]Background facts and procedural history can also be found in
the court's prior opinions in *Aspex Eyewear, Inc. v. E'Lite Optik,
Inc.*, 2002 WL 1592606, at *1-*2 (N.D. Tex. July 17, 2002)
(Fitzwater, J.), *Aspex Eyewear, Inc. v. E'Lite Optik, Inc.*, 2002 WL
1751381, at *1-*3 (N.D. Tex. Apr. 4, 2002) (Fitzwater, J.), and
*Aspex Eyewear, Inc. v. E'Lite Optik, Inc.*, 2001 WL 204775, at *1
(N.D. Tex. Feb. 27, 2001) (Fitzwater, J.).

uses magnets to securely attach an auxiliary lens frame to a pair of eyeglasses. Aspex sues defendant-counterplaintiff E'Lite Optik, Inc. ("E'Lite"), alleging that E'Lite is infringing the '545 patent. Only the meaning of certain limitations on the scope of claims 18 and 23 of the '545 patent are disputed. *See* Oct. 11, 2006 Joint Claim Construction Statement ("Statement"). The court need only construe the disputed claim limitations. *See, e.g., Vivid Tech., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803-05 (Fed. Cir. 1999) (construing only disputed claim language).

## II

The construction of patent claims is a matter reserved exclusively for the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). The court begins with the words of the claims. *E.g., Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1341 (Fed. Cir. 2001). "[T]he words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention . . . ." *Id.* at 1313.[2] This "provides an objective baseline from which to begin

---

[2]The court applies this standard to every limitation in dispute that it construes in this memorandum opinion.

claim interpretation." *Id.*

"[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* When "the meaning of a claim term as understood by persons of skill in the art is . . . not immediately apparent . . . the court looks to 'those sources available to the public that show what a person of skill in the art would have understood the disputed claim language to mean.'" *Id.* at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

"Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id.* (quoting *Innova/Pure Water, Inc.*, 381 F.3d at 1116). "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* "The claims, of course, do not stand alone. Rather, they are part of 'a fully integrated written instrument,' consisting principally of a specification that concludes with the claims. For that reason, claims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (citations omitted) (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978, 979 (Fed. Cir. 1995)). "[T]he

specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Id.* (quoting *Vitronics*, 90 F.3d at 1582).  "It is therefore entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Id.* at 1317.

"In addition to consulting the specification, [the] court 'should also consider the patent's prosecution history, if it is in evidence.'"  *Id.* (quoting *Markman*, 52 F.3d at 980).  "Although [the Federal Circuit has] emphasized the importance of intrinsic evidence in claim construction, [it has] also authorized district courts to rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Id.* (quoting *Markman*, 52 F.3d at 980).  "However, while extrinsic evidence 'can shed useful light on the relevant art,' . . . it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'"  *Id.* (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)).  The Federal Circuit has "viewed extrinsic evidence in general as less reliable than the patent and its prosecution history in determining how to read claim terms . . . ." *Id.* at 1318.

The court begins by addressing the disputed limitations on the scope of claim 18 of the '545 patent.

A

Claim 18 states:

> An eyeglass device comprising:
> a primary spectacle frame having two side portion extensions extending rearwardly therefrom having a top side and a rear side with a first magnetic member secured thereto, and
> an auxiliary spectacle frame including two arms for extending over a corresponding top side of said extensions, said arms respectively containing second magnetic members for cooperation with said first magnetic members and downwardly extended end portions for hooking said auxiliary spectacle frame to said primary spectacle frame, said arms and said first and second magnetic members supporting said auxiliary spectacle frame on said primary spectacle frame.

D. App. 9 (italics omitted).

The parties dispute the following limitations on the scope of claim 18: (1) "comprising"; (2) "having two side portion extensions extending rearwardly therefrom"; (3) "a rear side with a first magnetic member secured thereto"; (4) "two arms for extending over a corresponding top side of said extension";[3] (5) "said arms respectively containing second magnetic members for cooperation with said first magnetic members"; (6) "downwardly extended end

---

[3] The parties refer to "said extension" rather than to "said extensions," which is the term used in claim 18. *See* Ps. Br. 11; D. Br. 14.

portions for hooking said auxiliary spectacle frame to said primary spectacle frame"; and (7) "said arms and said first and second magnetic members supporting said auxiliary spectacle frame on said primary spectacle frame."[4]

B

Aspex contends that "comprising" means "one or more of each of the elements recited in claim 18 and any additional unrecited elements."[5]  Ps. Br. 10.[6]  E'Lite responds that the parties essentially agree on the meaning of "comprising," but that the court should adopt the construction "containing at least" for the sake of simplicity and clarity.  D. Resp. Br. 2.  Although in the Statement the parties do not explicitly identify this term as "undisputed," they do agree on its meaning.  E'Lite states as much

---

[4]The parties use numbering schemes to designate and refer to the disputed claim limitations.  The court will follow its own method.

[5]Although the parties refer to the "elements" of the claims at issue, the court will refer to claim "limitations" unless it is quoting another document.  *See Dawn Equip. Co. v. Ky. Farms Inc.*, 140 F.3d 1009, 1014 n.1 (Fed. Cir. 1998) ("The statute refers to a claim 'element,' but this court has moved towards the custom of referring to claim 'limitations,' reserving the word 'elements' for describing the parts of the accused device, though the court on occasion continues to use the words interchangeably." (citing *Sofamor Danek Group, Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1220 (Fed. Cir. 1996))).

[6]In this memorandum opinion, "Ps. Br." means Aspex's opening claim construction brief, "Ps. Resp. Br." means Aspex's reply claim construction brief, "D. Br." means E'Lite's opening claim construction brief, and "D. Resp. Br." means E'Lite's response claim construction brief.

in its response brief, and Aspex does not challenge E'Lite's proposed simplified construction. Moreover, the parties do not suggest that the patent applicant has acted as his own lexicographer concerning this term and has altered its customary meaning. Because the court discerns no dispute as to the meaning of "comprising," it will not now construe this term. *See, e.g., Vivid Tech., Inc.*, 200 F.3d at 803-05.[7]

C

Aspex maintains that "having two side portion extensions extending rearwardly therefrom" should be construed to mean "has two portions that extend outwardly and rearwardly of the sides of the lenses or the lens rims (if provided) to pivotally connect to the legs." Ps. Br. 10. E'Lite contends the limitation means "having extensions for pivotally coupling to a leg, extending rearwardly from the sides of the primary spectacle frame." D. Br. 5.

The principal dispute over this limitation is the addition of "outwardly" to describe the direction in which the extensions extend. Aspex's proposed addition of "outwardly" to the disputed

---

[7]Moreover, "comprising" is a transitional term that has a customary meaning in patent law. "[T]he use of 'comprising' creates a presumption that the body of the claim is open, . . . that the recited elements are only a part of the device, [and] that the claim does not exclude additional, unrecited elements." *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001) (citing *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000)).

limitation rests on two arguments. First, it contends that the "configuration and location of extension 11 in the patent drawings" show that the "side portion extensions" extend both rearwardly and outwardly, not just rearwardly. Second, it maintains that E'Lite agreed with Aspex's proposed construction in an October 23, 2003 Joint Claim Construction Statement (the "2003 Statement").

E'Lite responds that "outwardly" should not be imported into the claim language, because the drawings are not enough to overcome the presumption that the plain claim language controls its meaning. E'Lite does not address Aspex's second contention.

E'Lite's proposed construction relies on the specification, drawings, and claim language. It posits that the specification identifies distinct extensions attached to the "outer rim portions" of the primary spectacle frame, and that these extensions are defined by the specification, drawings, and claims as being for "pivotally coupling a leg thereto." D. Br. 6. Aspex responds that E'Lite's proposed construction is imprecise, because it fails to acknowledge that the extensions extend outwardly as well as rearwardly, and it fails to define properly the "side portions" of the primary spectacle frame from which the extensions extend, because the "outer rim portions" can be located either at the sides, top, or bottom of the lens rims.

The court rejects Aspex's first basis for adding "outwardly" to the description of the extensions. This ground relies solely on

the patent drawings and does not comport with the ordinary and customary meaning of the claim terms, as interpreted in light of the specification and claim language. Although drawings may aid in interpreting claim language, *e.g., Autogiro Co. of America v. United States*, 384 F.2d 391, 398 (Ct. Cl. 1967), drawings that depict a particular embodiment do not operate to limit the claims to that specific configuration. *E.g., TI Group Auto. Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.*, 375 F.3d 1126, 1138 (Fed. Cir. 2004) ("[T]he fact that the drawings are limited to a particular embodiment does not similarly limit the scope of the claims."); *Prima Tek II, LLC v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1148 (Fed. Cir. 2003) ("[T]he mere fact that the patent drawings depict a particular embodiment of the patent does not operate to limit the claims to that specific configuration"). Therefore, the court will not limit the scope of the claimed invention by interjecting "outwardly" into the construction on the sole basis of the patent drawings. *See, e.g., Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 956 (Fed. Cir. 2000) (rejecting patentee's argument that patent drawings define precise proportions of claim elements).

Nor can the court accept Aspex's second ground. The 2003 Statement is not a binding party admission regarding the construction of claim 18. In the 2003 Statement

> [t]he Parties were only able to reach
> agreement . . . [that] the phrase "two side
> portion extensions" *as used in Claims 12 and
> 16* [should be interpreted to mean] those
> portions of the primary spectacle frame which
> extend outwardly and rearwardly of the lenses
> or lens rims (if provided) to pivotally
> connect to the legs.

Ps. Br. Ex. 11 at 1 (emphasis added). E'Lite did not agree to a

construction of "two side portion extensions," as that term is used

in claim 18. Because the 2003 Statement applied only to claims 12

and 16, E'Lite is not bound by this construction in the context of

claim 18.

The court recognizes that "claim terms are normally used

consistently throughout the patent." *E.g., Phillips*, 415 F.3d at

1314 (citing *Rexnord Corp*., 274 F.3d at 1342). But the 2003

Statement is extrinsic evidence regarding the construction of claim

18. *See Markman*, 52 F.3d at 979 ("To ascertain the meaning of

claims, *we consider three sources*: The claims, the specification,

and the prosecution history." (emphasis added) (citations

omitted)). "If the meaning of a claim is unambiguous from the

intrinsic evidence, then a court may not rely on extrinsic evidence

for purpose of claim construction." *Avia Group*, 222 F.3d at 955.

The intrinsic evidence unambiguously excludes importing "outwardly"

into this disputed limitation. Thus it would be improper to

consider extrinsic evidence, including the 2003 Statement, to alter

the meaning clearly conveyed by the intrinsic evidence.[8]

Having determined that this limitation should not be construed to provide that the extensions extend "outwardly," the court now considers the parties' disagreement concerning the place from which the "side portion extensions" extend. Aspex argues that the extensions extend from "the sides of the lenses or the lens rims (if provided)." Ps. Br. 10. E'Lite maintains that the extensions extend from "the sides of the primary spectacle frame," although it later argues that they extend from "the outer rim portions of the frame." D. Br. 5.

Claim 18 speaks of "a primary spectacle frame having two side portion extensions extending rearwardly therefrom." D. App. 9. "Therefrom"——the place from which the "side portion extensions" extend——refers to the primary spectacle frame. The plain language of the claim does not support Aspex's contention that "side portion extension" could extend directly from the lenses. Moreover, neither party adequately explains the introduction of the phrase "lens rims" into this claim. Thus the court adopts E'Lite's proposed construction that comports most closely with the original claim language: "sides of the primary spectacle frame."

The parties both propose adding language to this limitation concerning the coupling with the legs. The parties' proposed

_____

[8]Moreover, Aspex has failed to explain adequately why the court should adopt the same construction of the term as it is used in claim 18.

- 11 -

constructions ("for coupling to a leg" and "to connect to the legs") convey essentially the same meaning, and the parties do not challenge this portion of their proposed constructions in their briefs. The court therefore construes "having two side portion extensions extending rearwardly therefrom" to mean "having two extensions extending rearwardly from the sides of the primary spectacle frame to pivotally connect to the legs."

D

Aspex posits that the phrase "a rear side with a first magnetic member secured thereto" means "a first magnetic member is connected directly or indirectly to a portion of the corresponding extension facing inward toward the wearer when the primary spectacle frame is worn, in a manner such that the connection is not likely to fail or give way." Ps. Br. 11. Aspex also posits that "magnetic member" means "either a permanent magnet or a ferromagnetic member, but at least either the first or second magnetic members must be a permanent magnet." Ps. Br. 10. E'Lite argues that the entire limitation should be construed to mean "with a first magnet horizontally secured to the rearwardly facing side of the extension," D. Br. 6, 14, and that the phrase "magnetic member" need not be construed, D. Resp. Br. 3.

Aspex argues that its proposed construction is consistent with the ordinary meaning of the words "rear" and "secure" and with the specification, including FIG. 3, which shows "first magnetic

members" secured in housings called "projections" that are connected to portions of the extensions that would face inward toward the wearer's head when the primary spectacle frame is worn. Aspex also contends that its construction of "magnetic member" is consistent with the ordinary meaning of the phrase and is supported by the Sadler patent, to which the '545 patent refers as prior art.

E'Lite does not dispute that "magnetic member" means at least "magnet," and it concedes "that it has two pairs of magnetic members in its frames." D. Resp. Br. 3. E'Lite thus argues that the term need not be construed.[9] E'Lite also defers to Aspex's construction of "secured" with the exception of "or indirectly," contending that this addition is nonsensical, vague, and indefinite. E'Lite maintains that horizontal orientation of the magnetic members is implied from the intrinsic evidence. It also posits that "thereto" is a confusing term in this limitation and should be construed as "to the rearwardly facing side of the extension." D. Br. 6. By eliminating "thereto" from its proposed construction, Aspex implicitly agrees with E'Lite that "thereto" should be eliminated when construing claim 18.

---

[9]Because the court holds for the reasons described below that "magnetic member" need not be construed, it need not address E'Lite's additional argument challenging Aspex's proposed construction of this phrase.

The court holds that the term "magnetic member" need not be construed. Because the parties agree that the term at least includes "magnet," and E'Lite concedes that magnets are present in its accused products, the court need not now construe this limitation. *See, e.g., Pall Corp. v. Hemasure Inc.*, 181 F.3d 1305, 1308 (Fed. Cir. 1999) ("Although the construction of the claim is independent of the device charged with infringement, it is convenient for the court to concentrate on those aspects of the claim whose *relation to the accused device is in dispute.*" (emphasis added)); *see also Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1580 (Fed. Cir. 1991) ("In 'claim construction' the words of the claims are construed independent of the accused product . . . . Of course the particular accused product (or process) is kept in mind, for it is efficient to focus on the construction of only the disputed elements or limitations of the claims.").

The parties disagree concerning the term "rear side." E'Lite contends that "rear side" means "'rearwardly facing' from the viewpoint of the wearer." D. Br. 6. Aspex maintains that "rear side" means "facing inward toward the wearer when the primary spectacle frame is worn." The court adopts Aspex's construction as the clearer of the two. *See U.S. Surgical Corp. V. Ethicon, Inc.*,

103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to *clarify* and when necessary explain what the patentee covered by the claims[.]" (emphasis added)); *Hyperion Solutions Corp. v. Outlooksoft Corp.*, 422 F.Supp.2d 760, 772-73 (E.D. Tex. 2006) (modifying the parties' proposed constructions to provide greater clarity); *Precor Inc. v. Fitness Quest, Inc.*, 2006 WL 2469123, at *7 (W.D. Wash. Aug. 23, 2006) (adopting clearer of two proposed constructions in light of fact that court's construction would ultimately be used by jury).

3

The parties agree that "secured" means "connected in a manner such that the connection is not likely to fail or give way." D. Resp. Br. 4; Ps. Br. 11. They only dispute whether "or indirectly" should be added after "connected." Aspex provides no basis for construing "secured" with the addition of "directly or indirectly." The court concludes that this addition does not provide any greater clarity to the claim. Thus the court construes "secured" as "connected in such manner that the connection is not likely to fail or give way."

4

The principal remaining dispute is whether horizontal orientation of the magnetic members is implied in this limitation. The court holds that the '545 patent's specification, its

references to magnetic orientation in claims other than claim 18, and its prosecution history support the construction that claim 18 is limited to magnetic members with horizontal orientation.

As a threshold matter, the court explains its meaning of magnetic members having horizontal orientation. When magnets with flat surfaces are engaged, the juncture of the magnetic members' surfaces forms a plane. When the magnetic members are oriented horizontally, this plane, if extended, intersects perpendicularly with the plane of the lens spectacles, which form a vertical plane when the eyeglasses are worn. When magnets are engaged so that they are oriented horizontally, the action of becoming engaged (the movement of engagement) occurs along an axis that is perpendicular to the plane of the magnetic members' orientation. Horizontally oriented magnets therefore engage vertically. For a fuller explanation for the basis of this terminology, *see infra* § IV(F), where the court construes the phrase "vertically engage."

The '545 patent's description of the preferred embodiment contains the only general statement in the specification regarding the particular orientation of the invention's magnetic members. This statement specifies the magnetic members as possessing horizontal orientation. "As shown in FIGS. 3-7, the engaging surfaces between magnetic members 14 in primary spectacle frame 10 and the magnetic members 22 in the auxiliary spectacle from 20 lie in a plane that is *substantially horizontal* when the eyeglass

device is worn." D. App. 7 (italics omitted except where court emphasis added). The '545 patent discloses only one preferred embodiment. All of the figures that illustrate this preferred embodiment perfectly fit this general description of magnetic members that possess horizontal orientation. When magnetic member 22 engages magnetic member 14, the magnetic members are clearly horizontally oriented.

Only three of the '545 patent's claims (claims 4, 6, and 23) specify the particular orientation of the invention's magnetic members. Each claim describes the magnetic members as possessing horizontal orientation. Claim 4 states: "a first magnet having a *horizontal surface* . . . including two side magnets, each secured to one of the auxiliary side portions for respectively engaging the *horizontal surface* for coupling a corresponding *horizontal surface* of one of the first magnets so as to secure the auxiliary spectacle frame to the primary spectacle frame." D. App. 8 (italics omitted except where court emphasis added). Claim 6 states, in relevant part: "including two first magnetic members respectively having a *horizontal surface* . . . including two auxiliary side portions, wherein the auxiliary spectacle frame further includes two second magnetic members each secured to one of the auxiliary side portions and having a *horizontal surface* of one of the first magnetic members so as to secure the auxiliary spectacle frame to the primary spectacle frame." *Id.* (italics omitted except where court

- 17 -

emphasis added). Claim 23 reads, in pertinent part: "said arms and said pair of magnetic members adapted to extend across respective side portions of a primary spectacle frame so that said pair of magnetic members can *vertically engage* corresponding magnetic members on a primary spectacle frame." *Id.* at 10 (italics omitted except where court emphasis added).

In interpreting claim 23, Aspex confuses *orientation* with *engagement*. Claim 23 refers to the magnetic members as "vertically engaging," meaning that, when engaged, they are *oriented* horizontally (with the flat surfaces of the magnets forming a horizontal plane). Conversely, claims 4 and 6 refer to the "horizontal surface" of the magnets. This requires that the magnets engage vertically. Thus every reference to the specific *orientation* of the magnetic members in the claims of the '545 patent specifies the magnetic members as possessing horizontal *orientation*.

The '545 patent's prosecution history also supports construing the disputed limitation of claim 18 so that it restricts the orientation of the magnetic members to a horizontal plane, meaning that the magnetic members engage vertically. In the process of obtaining what eventually became the reissue '545 patent, the patentee filed an information disclosure statement ("IDS") in October 1998 in which he attempted to distinguish his reissue patent from the prior art. The patentee began the IDS by stating

that the principal difference between his reissue patent and the ten patents discussed in the IDS is the positioning of the magnets with respect to the lenses. The patentee pointed out to the patent examiner that eight of the ten similar patents "describe magnetic coupling at the plane of the lenses." D. App. 12. The patentee thus apparently sought to differentiate the proposed patent on the ground that, when engaged, the magnets do not form a plane parallel with the lenses, but instead form a plane perpendicular to the lenses. The patentee then briefly described the principal differences between the ten similar patents and the proposed reissue patent. The last sentence for seven of these excerpts highlights that the prior art employs magnets that possess vertical orientation.[10]

One patent that the applicant attempted to distinguish was U.S. Patent No. 5,642,177 ("Nishioka"), on which the patent examiner later relied to reject some of the proposed claims. Nishioka requires the magnets to engage horizontally so that, when engaged, their surfaces form a vertical plane. The IDS reflects the patentee's attempt to limit the application to an eyeglasses device that employs magnetic members that engage vertically to form a horizontal plane when engaged.

_____

[10]These sentences include the phrase "with magnetic coupling seeming to occur on the plane of the lenses," "magnetic coupling again seems to occur on the plane of the lenses," or "again, magnetic coupling seems to occur on the plane of the lenses." D. App. 12-13.

After the patent examiner rejected some of the proposed claims on the basis of Nishioka, the patentee submitted a response. In distinguishing Nishioka from claims 12 and 24, the patentee stated:

> [i]n the Nishioka Patent, the magnets 3 in the auxiliary frame 1 engage vertically with the magnets 7 in the primary frame. The engagement surfaces are parallel to the plane of the lenses. In Claims 12 and 34[,] the amendment should have removed any possibility of ambiguity. The engagement is on a horizontal position, as opposed to the vertical plane defined by the lenses in the primary frame.[11]

D. App. 44. On this basis, the patentee contended that its claims could not have been anticipated by Nishioka. Similarly, the patentee submitted another response to the patent examiner with the same statement. The patentee later returned an amendment and interview summary to the Patent and Trademark Office in which it responded to rejection. It stated, in relevant part:

> The Nishioka patent, as previously argued in the November 27, 2000 Amendment, shows magnetic engagement along a vertical plane, which is not being recited in Claim 12. Further, a clarifying amendment to claim 12 has been made to more clearly distinguish the horizontal attraction between the first and second magnets.

_____

[11]The patentee misapplied the phrase "engage vertically" in the first sentence of this quoted paragraph, because the Nishioka magnets clearly engage horizontally and form a vertical plane when engaged. The patentee acknowledged that, when engaged, the Nishioka magnets form a plane "parallel to the plane of the lenses." D. App. 44. This statement contradicts the previous sentence concerning vertical engagement. The patentee is clearly attempting to juxtapose the positioning of the Nishioka magnets with his own.

*Id.* at 130.  The patentee repeated this objection almost verbatim in a later submission.

The notice of allowability that the patent examiner issued also supports construing claim 18 as limiting the position of the magnetic members to a horizontal orientation.  The examiner concluded:

> Nishioka fails to disclose the limitations "the primary spectacle frame including two side portion extensions extended therefrom for pivotally coupling a leg thereto and a first magnet having a *horizontal surface* and secured to said side portion extension of the primary spectacle frame" and "the auxiliary spectacle frame including two auxiliary side portions, the auxiliary spectacle frame including two second magnets, each secured to one of the auxiliary side portions for respectively engaging the *horizontal surface* of one of the first magnets so as to secure the auxiliary spectacle frame to the primary spectacle frame" in combination with claimed subject matter as claimed in claim 12 . . . . . Therefore claims 1-3, 12, 28, 36-41, 67-89 are allowable over the prior art of record.

*Id.* at 148-49 (emphasis added).  Although the examiner specifically pointed to proposed claim 12 in this statement, the difference in orientation of the magnetic members in the patentee's reissue application and Nishioka served as a basis to approve more claims than claim 12.

The starting point for construing a claim is the words of the claim, but claim terms are not to be read in isolation.  *See, e.g.,* *Phillips*, 415 F.3d at 1314.  Rather, the terms of each claim must comport with the language of the entire patent, including its

specification and the patent's prosecution history. *Id.* The court concludes that an ordinary person of skill in the art, having read the terms of claim 18 in the context of the specification, the other claims that refer to magnetic orientation, and the patent's prosecution history, would understand the phrase "magnetic members" to be limited to horizontal orientation.

5

Aspex first opposes this construction on the ground that it contradicts the court's opinion in *Aspex Eyewear, Inc. v. E'Lite Optik, Inc.*, 2001 WL 204775, at *1 (N.D. Tex. Feb. 27, 2001) (Fitzwater, J.). E'Lite urged the court to construe the claims of the '545 patent's predecessor to contain the limitation that they did not cover a back-mounted design, but claimed solely a top-mounted design (referring to direction in which magnetic members came together). *Id.* at *3. This is essentially the same construction argument that E'Lite now makes concerning horizontal and vertical engagements of the magnetic members. In *Aspex* the court rejected E'Lite's claim construction as being limited to a top-mounted design (i.e., magnetic members that engaged vertically and possessed horizontal orientation). *Id.* at *4.

Aspex's reliance on *Aspex* is misplaced. First, in *Aspex* the court construed U.S. Patent No. 5,568,207 ("the '207 patent"), the predecessor patent of the '545 patent. The '207 patent does not contain any of the specific language concerning the orientation of

the invention's magnetic members that is included in the '545 patent. Moreover, the '207 patent and the '545 patent have unique prosecution histories. As is evident from *Aspex*, the two statements on which E'Lite relied to support its construction were extrinsic evidence of negligible value. *See id*. at *4. By contrast, there is stronger intrinsic evidence from the specification and prosecution history of the '545 patent that indicates that the claims are restricted to vertical magnetic engagement (and thus possess horizontal orientation).

In arguing against the court's construction, Aspex invokes the doctrine of claim differentiation. Under this doctrine, when a patent claim specifically limits one of its terms and another claim employs the same term but without the limiting language, it is presumed that the limitation of the narrower claim is not present in the claim that does not contain the explicit limitation. *See Phillips*, 415 F.3d at 1314-15. This presumption may be rebutted, however, by intrinsic evidence. *Inpro II Licensing v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1354 (Fed. Cir. 2006). Because some of the '545 patent claims specifically limit the orientation of the magnetic members and the language of claim 18 does not likewise limit the magnetic members' orientation, Aspex contends that the court should not import this orientation restriction from the other claims into claim 18.

The proper starting place for analyzing this argument is the

presumption that each claim of the '545 patent has an independent scope. Because the language of claim 18 cannot itself support a construction limiting the orientation of the magnetic members, the court begins by presuming that the claim does not contain this limitation.

In *Inpro* the Federal Circuit affirmed the district court's construction of the claim term "host interface" to mean a particular kind of interface——a "parallel bus interface"——despite claim language that did not support this restriction. *Inpro,* 450 F.3d at 1352-53. Some of the patent's claims referred to a "parallel bus interface," while other claims, including the one the court construed, used the more general term "host interface." *Id.* at 1353. The court specifically rejected Inpro's claim differentiation argument and construed "host interface" to be limited to a "parallel bus interface." *Id.* at 1354, 1357. The court noted that "the only host interface described in the specification is a direct parallel bus interface." *Id.* at 1354. The specification also contained a statement emphasizing the importance of the parallel bus interface in solving the problems of the prior art. *Id.* The court considered specific statements in the description and the summary of the invention to support its conclusion that host interface meant a parallel bus interface. *Id.* at 1355-56 ("Claims are construed in light of the specification of which they are a part"). Additionally, the court found that the

prosecution history of the patent supported a construction limiting the general terms "host interfaces" to mean "parallel bus interface." *Id.* at 1356.

The reasoning and result of *Inpro* support a construction of claim 18 that requires magnetic members with horizontal orientation. As in *Inpro*, in each instance in which the '545 patent specifies the particular orientation of the magnetic members, it describes them as having horizontal orientation. Although some claims restrict the orientation of the magnets, others do not. The '545 patent's description of the preferred embodiment and its accompanying figures specifically limit the orientation of the magnetic members to be horizontal. The prosecution history strongly suggests that the patentee intended to distinguish its invention from the prior art based on the horizontal orientation of the magnetic members. Although the *Inpro* court had additional support for its limiting construction from statements in the summary of the invention that are not present in the '545 patent, the Federal Circuit did not suggest that this statement was the decisive factor.

Aspex cites *C.R. Bard Inc.* v. *United States Surgical Corp.*, 388 F.3d 858 (Fed. Cir. 2004), to support the contention that it is improper to import restrictions into the claims that are contained in the preferred embodiment. While preferred embodiments are not dispositive of claim constructions, *Bard* indicates that they

provide a useful interpretive guide. *Id.* at 865. "Under our precedent, a patentee's choice of embodiments can shed light on the intended scope of the claim, but a patent claim term is not limited merely because the embodiments in the specification all contain a particular feature." *Id.* (citing *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 907-08 (Fed. Cir. 2004). "On the other hand, a construction that excludes a preferred embodiment is rarely if ever correct." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (internal quotation marks omitted)).

Aspex urges a construction of claim 18 that would permit horizontal as well as vertical orientation for the magnetic members. This construction clearly excludes the '545 patent's preferred embodiment, which specifically describes the magnetic members as "substantially horizontal when the eyeglass device is worn." D. App. 7. Based on the description of the preferred embodiment alone, *Bard* suggests that Aspex's proposed construction is likely incorrect. Moreover, the *Inpro* court undoubtedly relied on statements in the description of the preferred embodiment as well as other intrinsic evidence to support its limiting construction of the claim at issue. *Inpro*, 450 F.3d at 1355.

*Bard* cuts against Aspex's construction of claim 18. In *Bard* the Federal Circuit affirmed a construction limiting the invention's texture to having "pleats," even though the claim

language itself did not specify the invention's texture. *Bard*, 388 F.3d at 860. The court held that the patent's specification and prosecution history provided independent bases to uphold the district court's narrowing construction. *Id.* at 866, 869. The court began its analysis by concluding: "A long line of cases indicate that the intrinsic record is the primary source for determining claim meaning." *Id.* at 861. The court noted that the statements in the specification concerning the texture of the invention consistently describe it as having pleats. *Id.* at 860. In two places the specification described the patent in global terms, and, in each instance, the specification defined the invention as having pleats. *Id.* at 863-64.

Regarding the prosecution history, the court noted, "[p]leating is implicated in each of [Bard's] responses to the examiner's rejections." *Id.* at 867. Aspex focuses on the next statement: "limiting claim 20 to requiring pleating based solely upon [Bard's] amendments and arguments made during the initial examination would likely be improper." *Id.* Nevertheless, the court concluded that the statements made in the initial examination alone "suggest a close connection between pleating and claim 20." *Id.* 867. Therefore, in combination with other intrinsic evidence, these statements during the initial examination could serve as a proper basis for the narrower construction of claim 20. The court recognizes that *Bard* had more evidence supporting the limiting

construction than that which supports the limiting construction of the '545 patent. But the *Bard* court held that the specification and prosecution history provided independent bases for upholding its narrow construction. Conversely, the limiting construction in this case, as in *Inpro*, is based on the intrinsic evidence as a whole. *Bard*'s discussion of the role of the prosecution history and other intrinsic evidence in interpreting claims counsels in favor of limiting the orientation of claim 18's magnetic members.

Aspex challenges the court's reading of the prosecution history. First, it questions the interpretation of the patentee's statements in the IDS distinguishing the prior art from his proposed invention. Aspex contends that the meaning of "seems to occur on the plane of the lenses" is that the prior art consists of front-mounted eyewear. It argues that the patentee did not intend to distinguish the invention from back-mounted eyewear, even if the magnetic members of such eyewear, when engaged, form a plane parallel to that of the lenses. Aspex's interpretation of the IDS is unpersuasive, because the limitation "on the plane of the lenses" encompasses both front- and back-mounted magnets, provided that when the magnets are engaged, they form a vertical plane. If the patentee had intended to distinguish the proposed patent from the prior art based on front- and back-sided magnetic mounting, he would have said so. Because at least eight times in the IDS the patentee used the phrase "on the plane of the lenses," the court

presumes that he meant what he said.

Aspex points out that some of the patentee's statements to the patent examiner attempting to distinguish Nishioka referred to proposed claims 12 and 34, neither of which became claim 18 of the '545 patent. Moreover, although the reason for allowance mentions the magnetic coupling on a horizontal surface as a principal basis for approving the '545 patent, it appears to limit this basis to proposed claim 12. These arguments, however, do not undercut the conclusion that the prosecution history supports a narrower construction of claim 18.

First, the patentee's initial statements in the IDS distinguishing the proposed patent from the prior art were not limited to any particular claim. The patentee made global statements about his patent. He specifically distinguished the patent from Nishioka based on the orientation of the magnetic members, without referring to any particular claim. In the patentee's responses to the patent examiner's rejections of claims 12 and 34, he distinguished the proposed patent from Nishioka based on the orientation of the magnetic members. Although the distinctive feature of these communications with the patent examiner appears to be limited to claims 12 and 34, these statements have a broader application in light of the IDS. Similarly, although the patent examiner's reasons for allowance identify horizontal orientation of the magnetic members as a

principal basis for approving the patent, the reasons appear to limit this difference to proposed claim 12.

Aspex points to a later sentence in the same paragraph that reflects that there are other differences between the '545 patent and Nishioka. *See* D. App. 149 ("Nishioka also fails to disclose the limitations as claimed in claims 36, 67-78, 81, 86-89."). But the last sentence of the paragraph, which lists more claims than claims 36, 67-78,81, 86-89, suggests that the horizontal surface distinction served as the basis to approve more claims than simply claim 12. *Id.* ("Therefore claims 1-3, 12, 28, 36-41, 67-89 are allowed over the prior art of record.").

But even assuming that this is an incorrect reading of these latter statements of the prosecution history, the clear, global statements in the IDS and the evidence in the '545 patent itself provide sufficient support for the court's construction of claim 18 as being limited to horizontally oriented magnetic members.

For the foregoing reasons, the court construes "a rear side with a first magnetic member secured thereto" to mean "a first magnetic member with horizontal orientation is connected in a manner such that the connection is not likely to fail or give way to the side of the extension facing inward toward the wearer when the primary spectacle frame is worn."[12]

---

[12]Although the court is persuaded by E'Lite's arguments concerning the magnetic members' orientation, it is not adopting E'Lite's proposed construction, i.e., "with a first magnet

Aspex posits that "two arms for extending over a corresponding top side of said extension" means "two auxiliary spectacle frame arms, at least a portion of each arm reaching above and across the top side of the corresponding extension." E'Lite argues that the limitation should be construed to mean "including two arms, each arm extending over the top side of a corresponding extension."[13] D. Br. 14.

Relying on FIG. 6, Aspex argues that its proposed construction is both consistent with the ordinary meaning of the words "extend" and "over" and with the specification. Aspex posits that the "arms" designated at 21, and as seen in FIG. 6, are the portions of the auxiliary frame that extend outwardly and rearwardly of the sides of the lens rims and secure the second magnetic members. Moreover, Aspex maintains that a portion of each arm reaches over

horizontally secured to the rearwardly facing side of the extensions." D. Br. 6, 14. Requiring that the magnetic members be "horizontally secured" to the primary frame's extensions does not address how these magnetic members engage the magnetic members of the auxiliary frame arms. In other words, under E'Lite's proposed construction, the magnetic members could be "horizontally secured" to the primary frame while engaging horizontally with the magnetic members of the auxiliary frame's arms. When engaged, the magnetic members would form a vertical plane. Therefore, the court adopts a construction that eliminates the ambiguity that remains in E'Lite's proposed construction.

[13]Aspex construes "arms" to mean "those portions of the auxiliary spectacle frame that extend outwardly and rearwardly of the side portions of the frame and secure the second magnetic members." Ps. Br. 11. Aspex incorrectly posits that E'Lite does not dispute the construction of this term.

and across the top of the corresponding primary frame extension, as shown in FIG. 6. E'Lite responds that the parties agree that the phrase "for extending over" is confusing. But E'lite contends that its proposed construction is less confusing. It also argues that Aspex incorrectly states that E'Lite does not dispute Aspex's construction of "arms." E'Lite posits that it merely agreed that certain terms (including "arms") were present in the accused products, and that construction is unnecessary. Moreover, E'Lite argues that the term "arms" in claim 18 is not one of the terms referred to in the Statement. E'Lite asserts that the term "arms" is a simple, plain language term that need not be construed.

E'Lite states that its proposed construction is merely a grammatical improvement that permits better understanding of the claim terms. *See* D. Br. 14 (stating that proposed construction is "merely a grammatical improvement"). Aspex responds that E'Lite generally agrees with its construction, but E'Lite's construction erroneously implies that the entire arm must extend over the corresponding extension. According to Aspex, FIG. 6 clearly shows that only a portion of the arm need extend over the corresponding extension. Aspex posits that there is nothing in claim 18 or in the remainder of the intrinsic record that would require the entirety of each arm to extend over the corresponding extension.

Because, by the terms of its own argument, E'Lite does not dispute the substance of Aspex's proposed construction of the

disputed claim limitation, the court need not now construe it. The court accordingly defers construing this limitation until it becomes apparent that the meaning is disputed.

F

Aspex argues that the limitation "said arms respectively containing second magnetic members for cooperation with said first magnetic members" means "the arms include second magnetic members which work together with the first magnetic members, such that the second magnetic members magnetically engage the first magnetic members either by contacting corresponding surfaces of the first magnetic members or by magnetically attracting corresponding surfaces of the first magnetic members without actual contact." Ps. Br. 12. E'Lite contends that it means "a second magnet horizontally contained in each of the arms for magnetic engagement with the first magnets."[14] D. Br. 14-15.

Aspex argues that its proposed construction is consistent with both the ordinary meaning of the words "contain" and "cooperate" and the disclosure of the specification. Aspex cites the description of FIG. 7 in the specification, which indicates that the corresponding magnetic members of the primary frame and the auxiliary frame can engage without touching, and that the description of the invention employing magnetic members that do not

_____

[14]E'Lite divides this limitation into two component parts. Aspex treats it as a single limitation.

- 33 -

physically contact is only one embodiment of the invention. E'Lite responds that as similarly stated in its construction of the previous limitation, "contained" means "horizontally contained."

E'Lite maintains that the implied limitation of horizontal orientation discussed *supra* in § III(D)(4) applies to the matching second magnets as well. E'Lite also contends that the term "magnetic engagement" is a less confusing construction of "cooperation," as is the phrase "the first magnets" for "said first magnetic members." Aspex maintains that there is nothing in the intrinsic record to support limiting the disputed limitation to magnets or horizontally oriented magnetic members. Moreover, Aspex argues that E'Lite should not be permitted to rewrite the claims to suit its grammatical preferences, and that Aspex's construction should be adopted because it is supported by the intrinsic record and the ordinary meaning of the words.

Consistent with § III(D)(1), the court refrains from construing "magnetic members." Following the analysis of § III(D)(4), the court construes the "second magnetic members" as possessing horizontal orientation. The only disputed term that remains to be construed is "cooperation." Aspex argues for replacing "cooperation" with "work together," but nevertheless acknowledges that "cooperation" is not a confusing term in this context. Both parties advance a construction that elaborates on the meaning of "cooperation" to mean "magnetically engage" or

"magnetic engagement."  Thus the only real difference in the proposed constructions is that Aspex's proposal further clarifies that claim 18 is consistent with the first and second magnetic members' engaging in two distinct ways: by direct contact with each other and by attraction at a distance.  Aspex contends that the preferred embodiment of the '545 patent and the figures demonstrate that the magnetic members do not need to be in contact with each other to be engaged.  The description of the preferred embodiment clearly indicates that having the magnetic members not actually touch is just "one" embodiment of the invention.  The court concludes that this is simply one embodiment of the invention.  The commonsense understanding of magnetic engagement also includes magnetic members actually touching one another.  Nothing in claim 18 suggests otherwise.  Therefore, the court construes "said arms respectively containing second magnetic members for cooperation with said first magnetic members" to mean "the arms include second magnetic members with horizontal orientation that cooperate together with the first magnetic members, such that the second magnetic members and first magnetic members magnetically engage either by direct contact of corresponding surfaces or by magnetically attracting corresponding surfaces without physical contact."[15]

---

[15]For the reasons set forth *supra* at note 12, the court does not adopt E'Lite's proposed language of "horizontally contained," but instead adopts the phrase "with horizontal orientation."

Aspex argues that "downwardly extended end portions for hooking said auxiliary spectacle frame to said primary spectacle frame" should be construed to mean that "each arm includes an end portion that extends downwardly relative to the remainder of the arm, and which is bent in a manner to connect or catch with the primary spectacle frame as if with a hook." Ps. Br. 12. E'Lite maintains that the phrase "downwardly extended portions" should be construed to mean "end portions extending downwardly towards, but not behind, the primary spectacle frame," and that the phrase "for hooking said auxiliary spectacle frame to said primary spectacle frame" should be construed to mean "for interlocking the auxiliary spectacle frame to the primary spectacle frame." D. Br. 15, 18. E'Lite later accepted Aspex's construction with the exception of the limitation "but not behind." D. Resp. Br. 5. Because E'Lite concedes that Aspex's proposed construction is acceptable——except to the extent that it fails to include the limitation "but not behind"——the court need not recount the parties' construction arguments concerning the undisputed claim limitation.

Based on the prosecution history of the '545 patent, E'Lite argues that the limitation includes "but not behind." E'Lite points to the patentee's numerous failed attempts to add a FIG. 8 showing end portions that extend downwardly as well as rearwardly behind the primary frame's extensions. The patent examiner

rejected the patentee's first rendition of FIG. 8 because it disclosed new matter not disclosed in the application. D. App. 157. The patent examiner rejected a later version of FIG. 8 because it introduced new matter. *Id.* at 124. In the second rejection, the examiner repeated that the basis for the rejection was that, in FIG. 8, the "end portion extends laterally past the rear edge of the projections." *Id.* Aspex later submitted a third version of FIG. 8, in which the end portions of the auxiliary frame's arms did not extend behind the rear edge of the projection. *See id.* at 168. Although the patent examiner ultimately approved this last version of FIG. 8, Aspex canceled its attempt to add a FIG. 8 to the '545 patent.

E'Lite interprets the cancellation of FIG. 8 as acquiescence to the patent examiner's determination that having the end portions extend laterally past the rear edge of the primary frame's projection was new matter. Aspex responds that E'Lite's attempt to limit the claims based on the patentee's cancellation of FIG. 8 should be rejected in view of the Federal Circuit's decision in *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 170 Fed. Appx. 710 (Fed. Cir. 2006) ("*Miracle II*"). Although *Miracle II* implicated the district court's construction of claims 12, 16, and 24 of the '545 patent, the claim language at issue is substantially the same as the limitation at issue in claim 18. *Id.* at 711. Moreover, the arguments in favor of limiting claims 12, 16, and 24 to require

that the arms of the auxiliary frames do not extend past the rear edge of the primary frame's projections containing or securing the magnetic members are identical to E'Lite's contentions with respect to claim 18. *Id.* at 712-14. The Federal Circuit clearly rejected the interpretation of the prosecution history that E'Lite now advances. "In view of the applicant's statements, we cannot say that the canceling of Figure 8 was a clear and deliberate disclaimer of the claim coverage suggested by Figure 8." *Id.* at 714. Because *Miracle II* resolves this construction issue, the court refrains from discussing the reasons the Federal Circuit gave in dismissing E'Lite's interpretation of the prosecution history. Thus the disputed limitation does not contain the limitation of "but not behind." Because E'Lite does not challenge the balance of Aspex's proposed construction, the court adopts it. Therefore, "downwardly extended end portions for hooking said auxiliary spectacle frame to said primary spectacle frame" means "each arm includes an end portion that extends downwardly relative to the remainder of the arm, and which is bent in a manner to connect or catch with the primary spectacle frame as if with a hook."

### H

Aspex argues that "said arms and said first and second magnetic members supporting said auxiliary spectacle frame on said primary spectacle frame" means "the arms and the first and second magnetic members maintain the auxiliary spectacle frame in position

on the primary spectacle frame so as to keep the auxiliary spectacle frame from falling, sinking, or slipping." Ps. Br. 13. E'Lite posits that this claim limitation means "the arms contacting the primary spectacle frame and the first and second magnets being magnetically engaged to support the auxiliary spectacle frame." D. Br. 18.

The principal difference between the parties' proposed constructions is whether claim 18 requires the auxiliary frame arms to physically contact the top side of the primary frame's extensions. Under Aspex's proposed construction, claim 18 permits the magnetic engagement between the magnetic members to provide the sole support for securing the auxiliary frames to the primary spectacle frames. E'Lite contends that claim 18 requires that the contact between the auxiliary frame's arms and the top portion of the primary spectacle frame's extensions contribute to the support of the auxiliary spectacle frames along with the support provided by the magnetic engagement of the magnetic members.

Aspex relies on the doctrine of claim differentiation to support its proposed construction. First, Aspex maintains based on the claim language alone that claim 18 does not require that the arms of the auxiliary spectacle frame physically touch the top side of the primary frame. Second, Aspex argues that claims 1, 19, and 20 all contain the express limitation that the auxiliary frame arms rest on top of the primary spectacle frame, thus contributing to

the support of the auxiliary frame to the primary frame along with the support provided by magnetic engagement. To support this argument, Aspex cites the court's construction of claims 1 and 2 of the predecessor patent, the '207 patent.

In *Aspex* the court held that claim 1's[16] reference to the auxiliary frame arms' "being engaged with and supported on said upper side portion of said primary spectacle frame" implied the limitation that the auxiliary frame arms must physically touch the upper side portion of the primary spectacle's extensions. *Aspex,* 2001 WL 204775, at *4. Aspex posits that, because relevant portions of claims 19 and 20[17] contain almost identical language to claim 1, claims 19 and 20 likewise contain the same "physical contact" limitation. Thus because some of the '545 patent's claims expressly limit the connection between the auxiliary frame and the primary frame to require the auxiliary frame's arms to physically rest on the top portion of the primary frame's extensions, this limitation should not be imported into a claim that lacks the same limiting language.

Based on the doctrine of differentiation, the court begins its

---

[16]The court notes that claim 1 in the '207 patent is the same in the '545 patent.

[17]Claim 19 states, in pertinent part: "an auxiliary spectacle frame including two arms for extending over and engaging a corresponding top side of said side portion extensions." D. App. 9. Claim 20 states, in relevant part: "an auxiliary spectacle frame including two arms for extending over and engaging a corresponding top side of said extensions." D. App. 9.

construction of this limitation of claim 18 by presuming that the
"physical contact" limitation in claims 1, 19, and 20 is not
present in claim 18.  The court presumes that claim 18 encompasses
two embodiments: (1) where the arms and upper side of the primary
frame physically contact, and the magnetic members engage but do
not contact; and (2) where the arms and upper side of the primary
frame do not contact, and the magnetic members do contact.  This
construction is presumptively correct, but it may be rebutted by
other intrinsic evidence.

E'Lite argues that multiple statements in the specification
overcome this initial presumption.  In the background of the
invention, the specification distinguishes the '545 patent from two
similar eyeglasses patents.  D. App. 7.  After briefly describing
the prior art, the patentee asserts:

> [i]n both of the [prior art] eyeglasses, the
> auxiliary lenses are simply attached to the
> frames by magnetic materials and have no
> supporting members for preventing the
> auxiliary lenses from moving downward relative
> to the frames such that the auxiliary lenses
> may easily move downward relative to the
> frames and may easily disengage from the
> frames when the users conduct jogging or
> jumping.

D. App. 7.  It can reasonably be implied from this assertion that,
in the '545 patent, the auxiliary lenses are not supported (i.e.,
prevented from moving downward relative to the frames) merely by
magnetic engagement.  Rather, the '545 patent employs supporting
members (arms) that assist the magnetic members in supporting the

auxiliary frame.

The '545 patent's summary of the invention ("Summary") states that the invention contains an "auxiliary spectacle frame including two side portions each having an arm extended therefrom for extending over and for engaging with the upper portion of the primary spectacle frame." D. App. 7. The Summary also states that "arms [of the auxiliary frame] are engaged with and supported on the upper portion of the primary spectacle frame so as to allow the auxiliary spectacle frame to be stably supported on the primary spectacle frame." *Id*. The language of the quoted statements is almost identical to the portions of claims 1, 19, and 20 that Aspex (and this court in *Aspex*) previously acknowledged as requiring the auxiliary frame's arms to physically rest on the upper side of the primary frame's extensions. The only significant difference in the use of this restrictive language is that, in the Summary, unlike in claims 1, 19, and 20, the '545 patent applies this "physical contact" limitation to the invention as whole. Global statements about the invention have particular interpretive weight. *See Bard*, 388 F.3d at 864.

The '545 patent's detailed description of the preferred embodiment likewise contains a global statement about the invention's requiring that the top side of the primary frame's extensions physically support the auxiliary frame's arms: "It is to be noted that the arms 21 are engaged with and are supported on the

- 42 -

upper portion of the primary spectacle frame 10 such that the auxiliary spectacle frame 20 may be stably supported and secured to the primary spectacle frame 10." D. App. 7. The auxiliary frame arms could not be "supported on" the upper portion of the primary spectacle frame unless the two were in physical contact. The '545 patent's figures, especially FIG. 7, corroborate the description of the preferred embodiment. D. App. 5-6.

The intrinsic evidence is sufficient to overcome the presumption created by the doctrine of claim differentiation. *See Inpro*, 450 F.3d at 1355-56 ("Claims are construed in light of the specification of which they are a part."). These statements in the '545 patent's specification support the conclusion that claim 18 requires auxiliary frame arms to physically rest on the upper side of the primary frame's extensions, so that the upper sides of the primary frame's extensions support the auxiliary frame in addition to the support provided by the magnetic attraction of the magnetic members. Aspex challenges E'lite's reliance on "the only disclosed embodiment" of FIG. 7, contending that the number of disclosed embodiments is not determinative of the meaning of the disputed claim terms. The court is not relying, however, on the number of embodiments for its construction of this limitation. Independent of the '545 patent's one embodiment, the global statements in the '545 patent's specification support this construction.

Aspex also relies on *Miracle Eyewear, Inc. v. Miracle Optics,*

*Inc.*, 2003 WL 24188188 (C.D. Cal. Feb. 14, 2003) ("*Miracle I*"), *vacated and remanded*, 170 Fed. Appx. 710 (Fed. Cir. 2006) (holding that district court erred in its claim construction), to support its proposed construction. In *Miracle I* the district court addressed the same "physical contact" issue in construing claims 12, 16, and 24 of the '545 patent. The *Miracle I* court construed these claims as not requiring the arms of the auxiliary frame to contact the extension of the primary frame. *Id*. at *12. This court respectfully disagrees with the reasoning of *Miracle I* because, in reaching its conclusion, the *Miracle I* court did not take into account any of the critically important global statements in the '545 patent's specification concerning the auxiliary arms' contact with the extensions of the primary frame. *Id*.

Therefore, the court construes this disputed limitation of claim 18 to require that the upper sides of the primary frame's extensions must physically contact the arms of the auxiliary frame. This physical contact thus supports the auxiliary arms in place in addition to any support coming from the engagement of the magnetic members. Because the remainder of the limitation is not seriously disputed, and since E'Lite's proposed construction is much closer to the original language of the limitation (with the exception of the physical contact limitation), the court adopts E'lite's proposed construction with some additions to particularize the kind of physical contact required between the auxiliary frame arms and

the primary spectacle's extensions. Accordingly, the court construes "said arms and said first and second magnetic members supporting said auxiliary spectacle frame on said primary spectacle frame" to mean "the arms contacting the upper side of the primary spectacle frame's extensions and the first and second magnetic members being magnetically engaged to support the auxiliary frame."

IV

The court now addresses the disputed limitations of the claim 23. Claim 23 states:

> An eyeglass device comprising:
> an auxiliary spectacle frame for supporting auxiliary lenses therein, said frame including a front side, a rear side, and oppositely positioned side portions, each of said side portions having an arm extended therefrom, each of said arms having a rearwardly directed free end for securing a magnetic member, and a pair of magnetic members respectively secured in the free ends of said arms, said arms and said pair of magnetic members adapted to extend across respective side portions of a primary spectacle frame so that said pair of magnetic members can vertically engage corresponding magnetic members on a primary spectacle frame.

D. App. 9-10 (italics omitted).

A

The parties initially disputed the following limitations of claim 23: (1) "therein"; (2) "therefrom"; (3) "front side"; (4) "comprising"; (5) "oppositely positioned side portions"; (6) "a rearwardly directed free end for securing a magnetic member"; (7) "magnetic members respectively secured in the free ends of said

arms"; (8) "said arms and said magnetic members adapted to extend across respective side portions of a primary spectacle frame"; and (9) "so that said pair of magnetic members can vertically engage corresponding magnetic members on a primary spectacle frame." The parties no longer dispute the meaning of the terms "therein," "therefrom," "front side," or "comprising." Accordingly, the court need not now construe them.

B

The construction of the phrase "oppositely positioned side portions" is essentially undisputed, although E'Lite states that its proposed construction should be adopted because it is less confusing. E'Lite argues that the limitation means "oppositely positioned side portions, being the outer rim portions of the auxiliary frame." D. Br. 22. Aspex posits that it means "those portions of the auxiliary spectacle frame located toward opposite outer sides of the lenses or lens rims (if provided)." Ps. Br. 15. But by the terms of its own argument, E'Lite has failed to raise any substantive dispute concerning the proper construction of this limitation. The court therefore defers construing it until E'Lite can show that the meaning is contested. *See, e.g., Vivid Tech., Inc.*, 200 F.3d at 803-05; *see, e.g., 3M Innovative Props. Co. v. Dupont Dow Elastomers LLC*, 361 F.Supp.2d 958, 966 (D. Minn. 2005) (holding that where differences between parties' proposed constructions were "sufficiently minor," construction was

unnecessary to eliminate confusion).

C

Aspex contends that "a rearwardly directed free end for securing a magnetic member" means "an unattached end of the auxiliary spectacle frame arm for connecting directly or indirectly to a magnetic member, in a manner such that the connection is not likely to fail or give way." Ps. Br. 16. Aspex also argues—as it did concerning claim 18—that "magnetic member" means "either a permanent magnet or ferromagnetic member, but at least either the first or second magnetic members must be a permanent magnet." Ps. Br. 16. E'Lite posits that the limitation should be construed to mean "a rearwardly directed end portion for securing a magnet." D. Br. 23. As with claim 18, E'Lite maintains that the phrase "magnetic member" need not be construed. For the reasons set out *supra* at § III(D)(1), the court concludes that it is unnecessary to construe the term "magnetic member."

E'Lite accepts Aspex's construction of "secure" with the exception of "or indirectly." As with claim 18, Aspex provides no support for adding "or indirectly" to its construction of "secure." Even if the addition of "or indirectly" does not alter the meaning of this limitation, it inserts more ambiguity into claim 23 than without it. The court therefore rejects the use of this phrase. Thus the only remaining term at issue in this disputed limitation is "free end."

- 47 -

Aspex argues that its construction is consistent with the ordinary meaning of the word "free" and the disclosure of the specification. Aspex relies on FIG. 7 and the description of the preferred embodiment to support its position that each auxiliary frame arm 21 has an unattached end that secures a magnetic member 22. E'Lite responds that Aspex's construction of "free end" as "unattached end" makes no sense, because the "free end" is attached to the arm of the auxiliary frame.

E'Lite argues that the '545 patent's description of this limitation is indefinite, and that, other than its appearance in claim 23, there is no mention, description, indication, figure reference, or any other support for the use of "free end" in the specification. In describing the area of the invention where the "free ends" should be, the specification simply refers to the "end portions" of the auxiliary frame's arms. D. App. 8. E'Lite maintains that the best construction of "free end" is "end portion."

The court holds that the best construction of "free end" is "end portion." First, construing "free end" to mean "unattached end," without qualification, is inconsistent with the undeniable requirement that the "free end" be attached to the auxiliary arm. Even with this qualification, however, Aspex's proposed construction is misleading. "Unattached" is the negative of the adjective "attached," which means "[t]acked on, fastened by

material union to . . . [or] [j]oined functionally[.]"  Oxford

English Dictionary (Oxford Univ. Press, 2d ed. 1989); *see Teleflex,*

*Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002)

("The ordinary meaning of a claim term may be determined by

reviewing a variety of sources, including . . . dictionaries and

treatises[.]" (internal quotations omitted)).  Construing "free

end" as "unattached end" could limit the "free end" to the small

part of the auxiliary frame arm 21 that is depicted to the left of

the magnetic member 22 in FIG. 7.  But limiting "free end" in this

way is inconsistent with the claim language of claim 23: "and a

pair of magnetic members respectively secured in the free ends of

said arms."  D. App. 9-10.  Considering FIG. 7, on which Aspex

heavily relies, the magnetic member 22 is secured to the auxiliary

frame arms on both the left and the right sides of the magnetic

member 22, as depicted in FIG. 7.  The right side of the auxiliary

frame arm 21 that helps to secure magnetic member 22 is also in

contact (i.e., material union) with the primary frame spectacle

(part 11).  Thus a piece of the auxiliary frame arm that secures

the magnetic members (what claim 23 calls the "free ends") can also

be materially united or functionally joined to the primary

spectacle frame.  Construing "free end" as "unattached end" is not

necessarily in conflict with claim 23's language, if unattached

means "not permanently fixed" (or some form of physical union that

is more than mere contact).  But "unattached end" also lends

support to a reading of the term that is inconsistent with the plain language of claim 23, if unattached means "not materially united" or "not functionally joined." The court rejects construing "free end" as "unattached end" because this term could convey an inaccurate understanding of the invention.

The court holds that "end portion" is the best construction of "free end," because the '545 patent does not use "free ends" at all in the specification, but it does use the phrase "end portion" when describing the part of the invention where the "free ends" would be. *See* D. App. 8.

Accordingly, the court construes "a rearwardly directed free end for securing a magnetic member" to mean "a rearwardly directed end portion for connecting a magnetic member in a manner such that the connection is not likely to fail or give way."

D

Aspex argues that "magnetic members respectively secured in the free ends of said arms" means "each magnetic member is connected directly or indirectly within the unattached end of an auxiliary frame arm, in a manner such that the connection is not likely to fail or give way." Ps. Br. 17. E'Lite construes this limitation to mean "magnets horizontally secured in the respective end portions of the arms." D. Br. 23.

The court's discussion of the previous claim limitations is adequate to resolve the construction of this limitation. First,

for the reasons already explained, *see supra* at § III(D)(1), the court refrains from construing "magnetic member." For the reasons stated *supra* at § IV(C), the court adopts Aspex's definition of "secure," with the exception of the phrase "directly or indirectly." Also, based on the rationale of the previous section, the court construes "free end" to mean "end portion."

Last, the parties disagree over whether this disputed limitation limits the orientation of the magnetic members. As with claim 18, E'lite contends that claim 23 requires the magnetic members to possess horizontal orientation when they are engaged. Aspex argues that limiting the magnetic members' orientation in claim 23 is improper. The parties rely on their arguments proffered with respect to the disputed limitation "first magnetic member secure thereto" of claim 18. While the court could resolve this construction dispute on the basis of its reasoning in § III(D)(4), it need not do so. In § III(D)(4) the court construes the magnetic members of claim 18 to have horizontal orientation, even though the claim language does not support this construction. The court relies on intrinsic evidence to overcome the presumption created by the doctrine of claim differentiation. Regarding claim 23, however, the doctrine of claim differentiation is inapposite. The last phrase of claim 23 states: "so that said pair of magnetic members can vertically engage corresponding magnetic members on a primary spectacle frame." D. App. 10. As discussed above, a

requirement that the magnetic members engage vertically (along a vertical axis) means that the magnetic members are horizontally oriented (i.e., their surfaces form a horizontal plane when engaged). Thus in construing this limitation of claim 23 as limiting the orientation of the magnetic members to a horizontal plane, the court need not refer to other intrinsic evidence, because the language of claim 23 itself calls for this construction.

The court construes "magnetic members respectively secured in the free ends of said arms" to mean "horizontally oriented magnetic members connected in the respective end portions of the auxiliary arms, in a manner such that the connection is not likely to fail or give way."[18]

E

E'Lite posits that the limitation "said arms and said magnetic members adapted to extend across respective side portions of a primary spectacle frame" should be construed to mean "the arms and the pair of magnets adapted to extend across respective side portions of a primary spectacle frame." D. Br. 24. Aspex did not propose a construction of this claim limitation in its opening claim construction brief. E'Lite later withdrew its request for the court to construe this limitation. D. Resp. Br. 7.

_____

[18]For the reasons set forth *supra* at note 12, the court does not adopt E'Lite's proposed language of "horizontally secured" but instead employs the phrase "horizontally oriented."

Accordingly, the court need not construe it.

F

The parties dispute the construction of the claim limitation "so that said pair of magnetic members can vertically engage corresponding magnetic members on a primary spectacle frame." Aspex posits that this limitation should be construed to mean "the pair of magnetic members can magnetically engage corresponding magnetic members on the primary spectacle frame in a plane that is substantially vertical when the eyeglass device is worn either by contacting corresponding surfaces of the primary spectacle frame magnetic members or by magnetically attracting those corresponding surfaces without actual contact." Ps. Br. 17. E'Lite maintains that this limitation should be construed to mean "so that the pair of magnets can magnetically engage corresponding magnets on a primary spectacle frame along a vertical polar axis." D. Br. 24.

Regarding the term "magnetic members," the court relies on its earlier conclusion that it need not now construe this phrase. *See supra* § III(D)(1).

The principal difference between the parties' proposed construction is the meaning of "vertically engage." Aspex maintains that this language means that, when the magnetic members are engaged, their surfaces form a plane parallel to that formed by the spectacle's lenses when worn. Ps. Resp. Br. 10. Thus Aspex argues that claim 23 requires vertically oriented magnetic members.

Aspex, however, glosses over an important distinction.  In claim 23, "vertically" modifies the verb "engage."  "Engage" describes the movement or force between the magnetic members as they are coming together or being attracted to each other by magnetic force. The adverb "vertically" describes the direction of this movement or force.  Thus "vertically engage" means that the movement or force between the magnetic members occurs along a vertical axis.  This also means that, when the magnets finally come together, their surfaces form a plane that is perpendicular to the axis of engagement.  Therefore, magnetic members that engage vertically possess horizontal orientation.  The court thus adopts E'Lite's proposed addition of "along a vertical polar axis" to the disputed limitation, because it conveys this distinction with greater clarity.

Concerning its proposed elaboration of "magnetic engagement," Aspex contends that the specification's description of FIG. 7 indicates that the corresponding magnetic members of the primary frame and auxiliary frame can engage without touching.  The specification also states that having the magnetic members engage without physical contact is only "one embodiment" of the invention. Ps. Br. 17.  According to E'Lite, Aspex's proposed elaboration of "engaged" as "either by contacting corresponding surfaces of the primary spectacle frame magnetic members or by magnetically attracting those corresponding surfaces without actual contact" is

confusing and unnecessary, because E'Lite agrees that the magnets of its invention engage one another.

In § III(D) the court addresses this specific construction dispute in construing "cooperate," which the parties agree means magnetic engagement. For the same reasons, the court concludes that the magnetic engagement of claim 23 encompasses two forms: physical contact and attraction at a distance.

The court construes "so that said pair of magnetic members can vertically engage corresponding magnetic members on a primary spectacle frame" to mean "so that the pair of magnetic members can magnetically engage corresponding magnetic members on the primary spectacle frame along a vertical polar axis, either by contacting the primary spectacle frame's magnetic members or by magnetic attraction without physical contact."

V

In summary, the court construes the following limitations of the '545 patent:

1. In claim 18, "having two side portion extensions extending rearwardly therefrom" means "having two extensions extending rearwardly from the sides of the primary spectacle frame to pivotally connect the legs."

2. "a rear side with a first magnetic member secured thereto" means "a first magnetic member with horizontal orientation is connected in a manner such that the connection is not likely to

- 55 -

fail or give way to the side of the extension facing inward toward the wearer when the primary spectacle frame is worn."

3. "said arms respectively containing second magnetic members for cooperation with said first magnetic members" means "the arms include second magnetic members with horizontal orientation that cooperate together with the first magnetic members, such that the second magnetic members and first magnetic members magnetically engage either by direct contact of corresponding surfaces or by magnetically attracting corresponding surfaces without physical contact."

4. "downwardly extended end portions for hooking said auxiliary spectacle frame to said primary spectacle frame" means "each arm includes an end portion that extends downwardly relative to the remainder of the arm, and which is bent in a manner to connect or catch with the primary spectacle frame as if with a hook." and

5. "said arms and said first and second magnetic members supporting said auxiliary spectacle frame on said primary spectacle frame" means "the arms contacting the upper side of the primary spectacle frame's extensions and the first and second magnetic members being magnetically engaged to support the auxiliary frame."

6. In claim 23, "a rearwardly directed free end for securing a magnetic member" means "a rearwardly directed end portion for connecting a magnetic member, in a manner such that the connection

is not likely to fail or give way."

7. "magnetic members respectively secured in the free ends of said arms" in claim 23 means "horizontally oriented magnetic members connected in the respective end portions of the auxiliary arms, in a manner such that the connection is not likely to fail or give way." and

8. "So that said pair of magnetic members can vertically engage corresponding magnetic members on a primary spectacle frame" in claim 23 means "so that the pair of magnetic members can magnetically engage corresponding magnetic members on the primary spectacle frame along a vertical polar axis, either by contacting the spectacle frame's magnetic members or by magnetic attraction without physical contact."

October 12, 2007.


_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE